UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

IN RE:
LEXINGTON JEWELERS EXCHANGE,
INC., D/B/A ALPHA OMEGA JEWELERS,
                DEBTOR.

Chapter 7
Case No. 08-10042-WCH

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

      The matter before the Court is the "Motion by Chapter 7 Trustee for Entry of an Order Compelling Compliance with Order Approving Agency Agreement" (the "Motion to Compel") filed by Harold B. Murphy (the "Trustee"), Chapter 7 trustee, the "Objection of Joint Venture to Motion of the Chapter 7 Trustee for Entry of Order Compelling Compliance with Order Approving Agency Agreement" (the "Objection") filed by the joint venture comprised of Tiger Capital Group, LLC, SB Capital Group, LLC, and The Gordon Company, Inc. (collectively, the "Joint Venture"), the "Reply to [the Objection]" (the "Reply") filed by the Trustee, and the "Response to [the Reply]" (the "Response") filed by the Joint Venture.  Through the Motion to Compel, the Trustee seeks an order directing the Joint Venture to tender to him the amount of an administrative expense claim incurred during the going out of business sale which the Joint Venture conducted on the Debtor's behalf as its agent.  The Joint Venture opposes on the basis that it already satisfied all its contractual obligations to pay the expenses of the sale.  For the reasons set forth below, I will grant the Motion to Compel.

## II. BACKGROUND

The facts necessary to decide the Motion to Compel are not in dispute. The Debtor was once a high-end luxury watch and jewelry retailer doing business as Alpha Omega Jewelers. Over thirty years, the Debtor grew from an operating a single storefront in Cambridge, Massachusetts to seven retail locations in Greater Boston, including one in The Burlington Mall in Burlington, Massachusetts. By 2002, having already earned a strong reputation among costumers as a purveyor of luxury brand timepieces, the Debtor's management sought to migrate the business to fine jewelry offerings. Due in part to an overly ambitious jewelry inventory acquisition program, however, the Debtor's substantial investment did not yield an equivalent cash flow. Despite attempts to restructure the business outside of bankruptcy, the Debtor ultimately filed a voluntary Chapter 11 petition on January 2, 2008.

In conjunction with the petition, the Debtor filed a series of motions on the January 2, 2008, including the "Motion for Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code (A) Authorizing the Sale of Substantially All of the Debtor's Assets, Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Approving Agency Agreement; and (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with a Sale of the Debtor's Assets" (the "Sale Motion"). As part of a "Global Transaction," the Sale Motion contemplated, *inter alia*, the approval of an agency agreement (the "Agency Agreement") whereby a professional liquidator to be determined by public auction would conduct going out of business sales (collectively, the "GOB Sale") at the Debtor's retail locations as the Debtor's agent. With respect to the expenses incurred during the GOB Sale, the Agency Agreement provided:

> 4.1 <u>Expenses</u>. Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be

2

paid by Agent in accordance with Section 4.2 below. As used herein, "Expenses" shall mean all Store-level operating expenses of the Sale which arise during the Sale Term at the Stores, limited to the following:

(a) Occupancy Expenses for the Stores on a per location and per diem basis in an amount *equal to* the aggregate per diem totals set forth on Exhibit 4.1.(a) hereto, *plus* the portion of any percentage rent obligations allocable to the Sale (as determined in the manner described in the definition of "Occupancy Expenses" below) incurred by Merchant under applicable leases or occupancy agreements plus the portion of any percentage rent obligations, if any allocable to the Sale (as determined in the manner described in the definition of "Occupancy Expenses") incurred by Merchant under applicable leases or occupancy agreements;

* * *

"Occupancy Expenses" means rent, CAM, real estate and use taxes, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto, and in the specific amounts set forth on Exhibit 4.1(a) attached hereto, and the pro rata portion of percentage and or overage rent attributable to Agent based on sales generated during the Sale Term as a proportion of the sales generated by Merchant and Agent for the applicable percentage rent measurement period under each lease which contains a provision for percentage or overage rent.[1]

To facilitate the timely payment of expenses, the Agency Agreement further required the Debtor and the agent to complete weekly sale reconciliations each Wednesday after the commencement of the GOB Sale.[2] Immediately following each reconciliation, the agent would either pay or offset from sale proceeds held by the Debtor all outstanding expenses based upon invoices and other documentation.[3] Throughout the term of the sale, the Debtor and the agent were to have "reasonable access" to each other's records with respect to sales taxes and expenses for the purpose of reviewing and auditing.[4] Then, at the conclusion of the GOB Sale, the Debtor and

---

[1] Agency Agreement, Docket No. 622-1, Ex. A at § 4.1.

[2] *Id.* at § 7.7.

[3] *Id.* at § 4.2(a).

[4] *Id.* at § 3.4(a).

agent would then "jointly prepare a final reconciliation," five days after which the agent would pay any remaining unpaid expenses.[5]

On January 25, 2008, I granted the Sale Motion and authorized the Joint Venture to, pursuant to the Agency Agreement, conduct the GOB Sale on the Debtor's behalf (the "Sale Order"). Indeed, pursuant to paragraph 19 of the Sale Order, the Debtor and its agent were expressly "authorized to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agreement and the related actions set forth therein."[6] To that end, on June 6, 2008, after the successful completion of the GOB Sale, the Debtor and the Joint Venture executed a Final Reconciliation Agreement wherein they represented that a final reconciliation had been completed and agreed that

> 1. The Merchant hereby acknowledges and agrees that all payments, performances and other obligations of the Joint Venture pursuant to the Agency Agreement have been fully made and completed to the satisfaction of the Merchant.
>
> * * *
>
> 3. The Merchant and the Joint Venture hereby acknowledge and agree that (i) the Final Reconciliation pursuant to the Agency Agreement has been fully reconciled and completed to the satisfaction of the Merchant and the Joint Venture, and (ii) no payments, performances or other obligations on the part of the Merchant or on the part of the Joint Venture remain to be paid or performed under the Agency Agreement.[7]

---

[5] *Id.*

[6] "Order Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code (A) Authorizing the Sale of Substantially All of the Debtor's Assets, Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Approving Agency Agreement; and (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such a Sale", Docket No. 208 at ¶ 19.

[7] Final Reconciliation Agreement, Docket No. 622-2, Ex. D.

The Joint Venture states that as part of the final reconciliation process, the Joint Venture credited the Debtor 50% of the value of six watches whose existence the Debtor never verified and the Joint Venture maintains it did not receive.

On April 28, 2008, the Debtor filed a motion to convert to Chapter 7 in anticipation of the completion of the GOB Sale. On May 12, 2008, I granted the motion to convert effective June 7, 2008 at 11:59 p.m. Upon conversion of the case, the Trustee was appointed Chapter 7 trustee.

On June 18, 2008, only ten days after the case was converted, the Debtor's landlord for its retail store located at the Burlington Mall, Bellweather Properties of Massachusetts, an affiliate of Simon Property Group ("Simon"), filed a proof of claim asserting a Chapter 11 administrative expense for unpaid percentage rent in the amount of $200,522.55 for a period from January, 2008, through April, 2008 (the "Simon Claim"). Notably, the Simon Claim was not filed on the main docket as a request for payment an administrative expense, but as a proof of claim on the claims registry. As a result, it appears the Trustee did not review the Simon Claim until four years later when the various adversary proceedings had been resolved. Nevertheless, on July 24, 2012, the Trustee contacted the Joint Venture and requested evidence of payment or, in the absence of such evidence, that the Joint Venture tender the amount of the Simon Claim to the Trustee. Although the Joint Venture supplied the Trustee with the weekly reconciliation reports, the Trustee ultimately determined that they did not reflect payment of the Simon Claim. Accordingly, the Trustee made a demand upon the Joint Venture on October 4, 2012, which the Joint Venture refused.

On February 26, 2013, the Trustee filed the Motion to Compel. The Joint Venture filed the Objection on March 21, 2013. The Trustee subsequently filed the Reply on March 25, 2013, and the Joint Venture filed the Response the following day. I conducted a hearing on the Motion

to Compel on March 27, 2013. At the conclusion of oral arguments from both parties, I took the matter under advisement.

### III. POSITIONS OF THE PARTIES

A. The Trustee

The Trustee's position is simple: the Agency Agreement provides that the Joint Venture shall be unconditionally responsible for all expenses incurred in conducting the GOB Sale; therefore, the Joint Venture is required to pay the Simon Claim. Indeed, the Agency Agreement refers to percentage rent and an exhibit which sets forth percentage rate due for each store location. While the Joint Venture asserts that the Debtor prepared the reconciliations based on its records, the Trustee points out that the Joint Venture nevertheless had access to those records.

Despite the language of the Final Reconciliation Agreement, the Trustee argues that it was not intended to be a release of the Joint Venture's obligation to pay percentage rent. He contends that if it was, the Final Reconciliation Agreement would have required Court approval. Even if I were to consider it a release, however, the Trustee urges that neither the Debtor nor the Joint Venture addressed the percentage rent claims prior to execution, rendering it a mutual mistake.

Finally, the Trustee also requests that the Joint Venture be ordered to pay his reasonable attorney's fees incurred to compel the Joint Venture's compliance with the Sale Order.

B. The Joint Venture

The Joint Venture objects for several reasons. First, the Joint Venture asserts that as a factual matter, it was the Debtor who prepared each of the weekly reconciliations and presented them to the Joint Venture for review. Because the Debtor's point of sale system was the only means of determining the calculation of the sales of merchandise during the sale, the Joint

6

Venture argues that it was entitled to rely entirely upon the accuracy of the Debtor's records to determine the expenses for which it would be liable under the Agency Agreement.

Next, the Joint Venture argues that in the Final Reconciliation Agreement, the Debtor expressly acknowledged that no further payments, performances, or other obligations of the Joint Venture remained outstanding. Thus, the Joint Venture contends that it has no further obligations under the Agency Agreement or sale order. Moreover, the Joint Venture states that the Final Reconciliation Agreement was expressly contemplated by both the Agency Agreement and paragraph 19 of the Sale Order. As such, the Joint Venture urges that I not find further Court approval was required. If I do, however, the Joint Venture submits that it should be given the opportunity to explore instances, such as the six watches, where it may have been improperly charged by the Debtor.

## IV. DISCUSSION

From the outset, I note that there is no dispute that that there is, in fact, an outstanding percentage rent claim due and owing to Simon or that it was incurred during the GOB Sale.[8] Therefore, the Simon Claim falls properly within the definition of "expenses" under section 4.1(a) of the Agency Agreement. Moreover, the Agency Agreement and its exhibits put the Joint Venture on notice of the obligation to pay percentage rent with respect to the Burlington Mall store. The question now presented is whether it currently remains an obligation of the Joint Venture.

The first argument raised by the Joint Venture is easily rejected. While the Joint Venture complains that the records necessary to prepare and verify the reconciliations were solely in the Debtor's possession, the Agency Agreement expressly gave the Joint Venture reasonable access

---

[8] The Joint Venture simply says that it is unaware of any outstanding claim.

7

to those records for the purpose of review and audit.[9] The Joint Venture simply *chose* to rely on the Debtor's reconciliations and apparently did not perform an independent audit. Further compounding the problem, I note that the reliance appears to have been on the reconciliations, not the Debtor's sales records.

Notwithstanding the failure to address any outstanding percentage rent claim due and owing to Simon, the Joint Venture relies on the Debtor's acknowledgement that "no payments, performances or other obligations on the part of the Merchant or on the part of the Joint Venture remain to be paid or performed under the Agency Agreement" in the Final Reconciliation Agreement.[10] Admittedly, the Agency Agreement called for a final reconciliation, but the reconciliation itself is no more than an agreed upon accounting of the GOB Sale. With the language quoted above, the Final Reconciliation Agreement purports to take that accounting one step further and release the Joint Venture from any remaining obligations. The Joint Venture correctly states that Sale Order gave authority to "execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agreement."[11] That said, nothing in the Sale Order blesses such agreements or makes them binding on any other party. To the contrary, the Final Reconciliation Agreement is in the nature of a settlement or compromise under Fed. R. Bankr. P. 9019 and would require notice to all parties in interest and Court approval before it would be binding on the Trustee.[12] While the Sale Order gave the Debtor the

---

[9] Agency Agreement, Docket No. 622-1, Ex. A at § 3.4(a).

[10] Final Reconciliation Agreement, Docket No. 622-2, Ex. D.

[11] Sale Order, Docket No. 208 at ¶ 19.

[12] *See, e.g., In re Hall*, No. 06-40872, 2010 WL 1730684 (Bankr. D. Kan. Apr. 28, 2010) (the purpose of court approval of a settlement is to bind the bankruptcy estate to any bargain struck by the debtor-in-possession); *In re OptInRealBig.com, LLC*, 345 B.R. 277, 291 (Bankr. D. Colo. 2006) ("The purpose and effect of seeking court approval of a compromise under Rule 9019 is to bind the bankruptcy estate to the terms of any bargain struck by a trustee or debtor-in-possession that affects the bankruptcy estate."); *Billingham v. Wynn & Wynn, P.C. (In re*

8

flexibility and means to effectuate the GOB Sale, it did not grant the Debtor and its agent *carte blanche* to do all "desirable" acts. To construe the Sale Order in the broader liberal sense articulated by the Joint Venture would be to invite the parties to engage in potentially unchecked (or limitless) discretion and to create an opportunity for mischief in the sale process which could potentially damage the estate and prejudice creditors.

The Motion to Compel does no more than ask the Joint Venture to do that which it is contractually obliged.

## V. **CONCLUSION**

In light of the foregoing, I will enter an order granting the Motion to Compel and directing the Trustee to file a fee application.

*/s/ William C. Hillman*

_____
William C. Hillman
United States Bankruptcy Judge

Dated: May 29, 2013

Counsel Appearing:

    Kathleen R. Cruickshank, Murphy & King, P.C., Boston, MA,
        for the Chapter 7 trustee
    James P. Ponsetto, Greenberg Traurig, LLP, PLACE, Boston, MA,
        for the Tiger Capital Group, LLC, SB Capital Group, LLC, and The Gordon Company, Inc.
    Robert Boghosian, Andrew L. Buck, Cohen Tauber Spievack & Wagner P.C., New York, NY,
        for the Tiger Capital Group, LLC, SB Capital Group, LLC, and The Gordon Company, Inc.

---

*Rothwell)*, 159 B.R. 374, 379 (Bankr. D. Mass. 1993) ("A settlement agreement is unenforceable without notice of the settlement to creditors or a court order approving it."); *Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289, 291 (E.D.N.Y.1992) ("debtors cannot bind their estates to compromises absent bankruptcy court approval").